**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6499
E-mail: jpafiti@pomlaw.com

**Attorney for Plaintiff**

[*Additional counsel on signature page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIKAS ARORA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>    vs.<br><br>GOPRO, INC., NICHOLAS D. WOODMAN and BRIAN T. MCGEE,<br><br>Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Vikas Arora ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GoPro, Inc. ("GoPro" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of GoPro between August 4, 2017 and January 5, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     GoPro, Inc. develops and manufactures wearable and gear mountable cameras along with related accessories.  Its primary product offerings include: HERO5/HERO6, a line of cloud-connected cameras; GoPro Plus, a cloud-based storage solution that enables subscribers to access, edit and share content; Quik, a desktop app that provides expanded editing options for power users; Capture, a mobile app that allows users to preview and play back shots, control their GoPro cameras, and share content on the move using their smartphones; Karma, a compact, foldable drone and versatile stabilization solution; and Karma Grip, a handheld and body-mountable camera stabilizer to capture zero-shake and smooth video. GoPro markets and sells its products primarily through retailers and distributors, as well as through its website.

3.     Founded in 2002, the Company was formerly known as "Woodman Labs, Inc." and changed its name to "GoPro, Inc." in February 2014.  GoPro is headquartered in San Mateo, California, and its stock trades on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "GPRO."

4.     After making bullish statements about the Company's purported then-present strong business metrics and financial prospects after the close of trading on August 3, 2017, including that GoPro was "'building momentum,'" experiencing "'[s]trong demand'" and "'continu[ing] to track toward [its] goal of full-year, non-GAAP profitability in 2017,'" and then ratchetting up GoPro's third

quarter 2017 ("3Q17") financial guidance on September 7, 2017 by emphasizing that "'[c]onsumer demand for GoPro products [remained] strong'" and claiming that its "'[c]hannel inventories ha[d] been reduced,'" ostensibly facilitating even more sell-through of GoPro product through retailers during the all-important 2017 holiday season, several of GoPro's senior executives cashed in with unusually timed stock sales. The executives who sold shares included GoPro's Chief Executive Officer ("CEO") Nicholas D. Woodman ("Woodman"), who sold more than 700,000 shares of his personally held stock for gross proceeds of more than $6.5 million, and its Chief Financial Officer ("CFO") Brian T. McGee ("McGee"), who sold more than 7,500 shares of his personally held stock for gross proceeds of more than $62,000. Indeed, the timing of these stock sales was so unusual that defendant Woodman sent an email to GoPro's employees, stating in relevant part:



Hey GoPro,

     I want to brief you on a personal matter: my 10b5-1 stock sales plan has started selling some of my shares and it's likely that this will generate some speculation in the media. I want to make sure that you all get the facts directly from me.

     **What's Going On?**  My 10b5-1 stock plan was set up a while ago to automatically sell shares for me when certain criteria are met. *It's now kicking in for the first time.*

     **Why Sell?** *I haven't sold any stock for the past three years.* Both common sense and my financial advisors tell me that I need to diversify some of my ownership in GoPro into other things. I've put this off for a very long time but I have to acknowledge it's not very smart of me to have so many eggs in one basket.

     My 10b5-1 plan is entirely financial and has nothing to do with my excitement for our future. *As those of you who work directly with me know, I literally cannot wait for all the new products and advancements we've got lined up for 2018 and beyond. We're the best team we've ever been, we're putting out our best products ever and I only see this being more the case moving forward. I'm so excited for our future 'cause we're going to rock it!!!!*

     Thanks for understanding and, if there is any public reaction to the sales, I apologize for this distraction!

Hi5 - Nick

    5.    On Monday January 8, 2018, before the open of trading, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Announces Preliminary Fourth Quarter 2017 Results,"

revealing that its fourth quarter 2017 sales were $340 million, significantly below analysts' projections of over $470 million.  GoPro blamed the results on the slashing of prices for its HERO6 Black, HERO5 Black and HERO5 Session cameras, as well as its Karma drone, during the quarter, which the Company had been forced to engage in to move inventory and which had a negative $80 million impact on revenues. GoPro also disclosed it was cutting more than one-fifth of its workforce and exiting the drone market altogether, requiring it to dump the rest of its Karma drone inventory. GoPro had cut the price for its HERO5 Black camera in December 2017, and announced it was now reducing the price of its newly launched HERO6 model to $399 from $499. The workforce reduction would cost GoPro $33 million, mainly in severance costs.

6.     On this news, GoPro stock price declined, falling from a close of $7.52 per share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018, before closing at $6.56 per share on unusually high trading volume of more than 59 million shares traded.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) demand for the GoPro brand had dramatically declined and retailers were not stocking up for 2017 holiday sales to the extent GoPro had budgeted for; (ii) demand for GoPro's Karma drones was sufficiently weak that the Company could no longer afford to manufacture and sell them profitably; (iii) the Company would be forced to dramatically slash prices on its newly launched HERO6 Black and its dated HERO5 Black and HERO5 Session cameras, as well as its Karma drone, during the quarter and would need to further slash HERO6 prices in January 2018; and (iv) as a result of the foregoing, GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as substantial acts and transactions giving rise to the violations of law complained of herein occurred in this district. Further, GoPro's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying Certification, purchased GoPro securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

14.     Defendant GoPro is incorporated in Delaware, and the Company's principal executive offices are located at 3000 Clearview Way, San Mateo, California 94402.  GoPro's common stock trades on the NASDAQ under the ticker symbol "GPRO."  During the Class Period, GoPro had more

than 109 million shares of its Class A common stock issued and outstanding, which shares traded in an efficient market on the NASDAQ under the ticker symbol "GPRO." GoPro was followed by scores of stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations at investor and analyst conferences. GoPro also filed periodic public reports with the SEC and regularly issued press releases to the financial press.

15.     Defendant Nicholas D. Woodman ("Woodman") founded and has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman.

16.     Defendant Brian T. McGee ("McGee") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

17.     The Defendants referenced above in ¶¶ 15-16 are sometimes referred to- herein as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of GoPro's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.    GoPro, Inc. is an American technology company founded in 2002 by Defendant Woodman.  It manufactures eponymous action cameras and develops its own mobile apps and video-editing software. Founded as Woodman Labs, Inc., the Company eventually focused on the connected sports genre, developing its line of action cameras and, later, video editing software.

20.    GoPro also developed and launched a quadcopter drone, Karma, released in October 2016.  A month later, in November 2016, GoPro recalled the Karma drone following reports that a defective battery compartment door caused the drones to lose power and drop out of the sky.

21.    Nevertheless, Defendant Woodman told *TechCrunch* in January 2017 that the Company was returning to profitability, banking on sales of its new HERO5 camera, and that, citing the strength of GoPro's brand, it was not only going to continue selling the relaunched Karma drone, but even planned to expand its line of drones.

22.    In May 2017, following the Company's issuance of its fiscal 2016 annual report on Form 10-K, the SEC directed the Company to make more fulsome disclosures about "known trends and uncertainties" impacting its business as required by SEC Rule SK-303, with GoPro pledging to do so, stating in pertinent part as follows:

> [SEC:]  1. ***We note that there have been significant increases in your research and development expenses in recent periods, and that you expect this trend to continue in 2017. Please revise your MD&A to disclose any known trends or uncertainties with respect to your research and development expenses, and discuss if known the anticipated drivers therefor. For example, it appears that certain of your R&D expenditures have related to the resolution of issues related to Karma.***

> [GoPro:] We respectfully advise the Staff that we considered known trends and uncertainties with respect to our operating expenses (including research and development expenses) in preparing MD&A disclosures in the Form 10-K and believe we have adequately addressed such trends and uncertainties. By way of background, the Form 10-K includes the following disclosure pertaining to known trends and uncertainties, and the anticipated drivers therefor, regarding our anticipated operating expenses as well as the focus of our research and development spending . . . .

***

- 7 -

*We advise the Staff that we intend to continue to review and consider our disclosures regarding known trends and uncertainties in future filings, and include appropriate discussion in MD&A accordingly . . . .*

(Emphasis added.)

## Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on August 4, 2017.  On August 3, 2017, post-market, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Announces Second Quarter 2017 Results," announcing the financial results for the period ended June 30, 2017, and providing 3Q17 and fiscal 2017 financial guidance.  In addition to reporting 2Q17 revenues of "$297 million, up 34% year-over-year and 36% quarter-over-quarter," the release emphasized that ***"[s]harp focus on inventory and channel management resulted in a 39% reduction in inventory quarter-over-quarter"*** so that "forward weeks of supply in the channel [were] down 25%," with "[b]oth position[ing] [GoPro] well for upcoming product launches." In addition, the release stated that "***[g]lobal sell-thru of cameras increased 18% sequentially" and "camera sell-thru above $300 was up 13% year-over-year,***" and that "***HERO5 Black was the best-selling digital image camera*** in the U.S. in the second quarter, according to The NPD Group's Retail Tracking Service." The release quoted defendant Woodman, who emphasized that GoPro was "'building momentum'" and was continuing to experience "'[s]trong demand'" such that, with "'HERO6 and Fusion, [its] 5.2K spherical camera . . . on course to launch later this year,'" GoPro "'continue[d] to track toward [its] goal of full-year, non-GAAP profitability in 2017.'" The release also provided strong 3Q17 and fiscal 2017 financial guidance, stating in pertinent part as follows:

**Business Outlook**

GoPro is providing the following guidance:

- Third Quarter 2017
  - Revenue of $300 million +/- $10 million
  - GAAP and non-GAAP gross margin to be 37% +/- 1%

- GAAP operating expenses of between $131 million and $133 million
- Non-GAAP operating expenses of between $115 million and $117 million
- GAAP EPS to be $(0.24) +/- $0.05
- Non-GAAP EPS to be $(0.06) +/- $0.05

• 2017
- GAAP operating expenses below $570 million
- Non-GAAP operating expenses below $495 million

24.     On that same day, during an earnings conference call with investors and analysts to discuss 2Q17 results, Defendants Woodman and McGee provided additional positive commentary about the Company's business metrics and financial prospects, stating in pertinent part:

**Nicholas Woodman - GoPro, Inc.**

Good afternoon. Our second quarter performance capped a strong first half of the year for GoPro, where brand engagement, ***consumer demand, and sell-through of our products were better than expected.***

Our second quarter was EBITDA-positive and our revenue grew year-over-year by 34% to $297 million. Inventory was down 39% in the second quarter, positioning us well for new product releases later this year. For the third consecutive quarter, our premium priced camera, HERO5 Black, was the best-selling camera in the United States, and GoPro's drone, Karma, is the nation's number two selling drone brand.

Our second quarter gross margin was 36%, a sequential improvement, buoyed by the margin strength of HERO5 Black and HERO5 Session. We expect margins to continue to improve throughout 2017 with the introduction of new products. And we remain on track to reduce our annual operating expenses by 30% year-over-year to less than $495 million.

***To summarize, we're seeing strength across our business, thanks to strong demand and improved focus and execution.*** We continue to track toward our goal of low double-digit revenue growth and full year non-GAAP profitability in 2017. While it's encouraging to see improved momentum in our business, we're particularly excited about innovations in our roadmap that will enhance our relevance to consumers in this increasingly smartphone-centric world.

\*\*\*

**Brian McGee - GoPro, Inc.**

***Our strong revenue growth was principally driven by demand*** from our HERO5 Black camera and sequential revenue growth from Karma. Camera units shipped was over 1 million in the second quarter, a sequential and year-over-year increase of 44% and 40%, respectively. Our HERO5 Black camera with the retail price point of $399 accounted for over 60% of our camera units shipped in the quarter and over 70% of the total second quarter camera revenue.

(Emphasis added.)

25.     On August 4, 2017, GoPro filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "2Q17 10-Q").  For the quarter, GoPro reported a net loss of $30.54 million, or $0.22 per diluted share, on revenue of $296.53 million, compared to a net loss of $91.77 million, or $0.66 per diluted share, on revenue of $220.76 million for the same period in the prior year.

26.     In the 2Q17 10-Q, the Company purported to fully disclose to investors any "known trends and uncertainties" then affecting its business, as the Company had promised in May 2017 to do going forward. According to the 2Q17 10-Q, the Company then expected 4Q17 sales to be larger than 2Q17 and 3Q17 sales, stating in pertinent part as follows:

> **Seasonality.** Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

27.     Also in the 2Q17 10-Q, GoPro reiterated that "seasonal consumer shopping patterns significantly affect [its] business," and that it had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," such that "[f]ourth quarter revenue comprised [a full] 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively." Defendants stated that GoPro then "anticipate[d] that this seasonal impact [was] likely to continue."

28.     The 2Q17 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2Q17 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On September 7, 2017, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Expects Third-Quarter 2017 Revenue and Gross Margin Will be at the High-End of Guidance," stating that the Company was then experiencing "strong consumer demand for the brand," and with channel inventories of dated product, i.e., HERO5 cameras, "reduced," the upcoming launch of HERO6 and Fusion, the 5.2K spherical camera, was expected to be even more profitable, justifying an increase in GoPro's 3Q17 financial guidance. The release stated in pertinent part as follows:

> SAN MATEO, Calif., Sept. 7, 2017 – GoPro, Inc, (NASDAQ: GPRO) today announced revenue and gross margin for the third quarter of 2017 are both expected to be at the high end of their previously announced respective ranges of between $290-$310 million and 36-38 percent.  GoPro also forecasts the third quarter to be profitable on a non-GAAP basis, though not profitable on a GAAP basis.

> "***Consumer demand for GoPro products is strong,***" said GoPro Chief Operating Officer CJ Prober. "Channel inventories have been reduced and we're incredibly excited about the upcoming launch of two great new products, HERO6 and our 5.2K spherical camera, Fusion."

> (Emphasis added.)

30.     On November 1, 2017, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Announces Third Quarter 2017 Results," announcing the financial results for the period ended September 30, 2017, and providing 4Q17 and updated fiscal 2017 guidance. In addition to reporting that 3Q17 "[r]evenue was $330 million, up 37% year-over-year," the release announced that GoPro had reached profitability in 3Q17, reporting that "***GAAP net income for the third quarter was approximately $15 million, or $0.10 per share*** – a sharp improvement over a GAAP net loss of $104 million in the third quarter of 2016." The release also highlighted that "***[a]verage sales price (ASP) increased by 22% year-over-year and 3% sequentially*** . . . driven by the strong performance of the premium-priced HERO6," that "***HERO6 Black launched on September 28*** . . . with strong sales execution and a 93% channel fill rate at retail," that "***[p]rior to the HERO6 launch, HERO5 Black was the best-selling digital image camera in the U.S. for four straight quarters*** – holding that chart

position since its launch in 2016, according to The NPD Group's Retail Tracking Service," and that "**GoPro's drone, Karma, was the #2 selling drone in the U.S. priced $1,000 and above** during the six months ending September 2017, according to the NPD Group's Retail Tracking Service." The release also quoted Defendant Woodman as lauding the Company's purportedly ongoing strong business metrics and financial prospects – and return to profitability – stating in pertinent part as follows:

> "**GoPro has turned a corner, restoring growth and profitability to our business** . . . . We are dedicated to growing as an innovative company, while being a vigilant steward of shareholder capital."

> "During the quarter we generated $47 million in cash and gross margins were 40 percent. Year-over-year, we grew revenue by 37 percent and dramatically reduced operating costs without impacting our product roadmap. We launched our premium-priced HERO6 Black **with global on-shelf availability and strong critical acclaim. We are now focused on driving consumer demand to reach our goal of full-year double-digit revenue growth and non-GAAP profitability**."

(Emphasis added.)

31.     The press release also provided the following 4Q17 and updated fiscal 2017 financial guidance, purportedly justified by the Company's then-current business metrics and financial prospects:

**Business Outlook**

GoPro is providing the following guidance:

- Fourth Quarter 2017
  - ***Revenue of $470 million +/- $10 million***
  - GAAP and Non-GAAP gross margin of 41.5% +/- 50 basis points
  - GAAP operating expenses of $149 million +/- $1 million
  - Non-GAAP operating expenses of $130 million +/- $1 million
  - GAAP EPS to be between $0.25 and $0.35
  - Non-GAAP EPS to be between $0.37 and $0.47

- Full Year 2017
  - ***Revenue of $1.315 billion +/- $10 million***
  - GAAP operating expenses below $570 million
  - Non-GAAP operating expenses below $490 million
  - GAAP EPS to be between $(0.65) and $(0.55)
  - Non-GAAP EPS to be between $(0.02) to $0.08

(Emphasis added.)

32.     On that same day, Defendants held a conference call with investors and analysts, providing additional positive commentary about the Company's then-present business metrics and financial prospects.

33.     On November 3, 2017, GoPro filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "3Q17 10-Q").  For the quarter, GoPro reported net income of $14.66 million, or $0.10 per diluted share, on revenue of $329.81 million, compared to a net loss of $104.07 million, or $0.74 per diluted share, on revenue of $240.57 million for the same period in the prior year.

34.     In the 3Q17 10-Q, the Company purported to fully disclose to investors any "known trends and uncertainties" affecting its business as required by SEC Rule SK-303 and as the Company had promised in May 2017 to do going forward. According to the 3Q17 10-Q, the Company still expected 4Q17 sales to be larger than 2Q17 and 3Q17 sales, stating in pertinent part as follows:

> *Seasonality.* Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

35.     Also in the 3Q17 10-Q, GoPro reiterated that it had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," noting that "[f]ourth quarter revenue comprised 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively" – so always more than 25% of annual revenues and sometimes nearly 50%. GoPro further stated that it "anticipate[d] that this seasonal impact [was] likely to continue."

36.     The 3Q17 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 3Q17 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     The price of GoPro common stock increased on defendants' false and misleading Class Period statements, reaching an intraday Class Period high of $11.89 per share on September 27, 2017. Several of GoPro's senior executives cashed in with unusually timed stock sales, including defendant Woodman, who sold 706,980 of his personally held GoPro shares between November 3, 2017 and November 7, 2017 at between $9.00 and $9.30 per share, reaping $6,520,627 in gross proceeds, and defendant McGee, who sold 7,541 of his personally held GoPro shares on November 16, 2017 at $8.23 per share, reaping $62,062 in gross proceeds. Indeed, the timing of these stock sales was so unusual that defendant Woodman sent an email to GoPro's employees, in which Woodman stated, in relevant part:

**GoPro**

Hey GoPro,

        I want to brief you on a personal matter: my 10b5-1 stock sales plan has started selling some of my shares and it's likely that this will generate some speculation in the media. I want to make sure that you all get the facts directly from me.

        **What's Going On?**  My 10b5-1 stock plan was set up a while ago to automatically sell shares for me when certain criteria are met. *It's now kicking in for the first time.*

        **Why Sell?**  *I haven't sold any stock for the past three years.* Both common sense and my financial advisors tell me that I need to diversify some of my ownership in GoPro into other things. I've put this off for a very long time but I have to acknowledge it's not very smart of me to have so many eggs in one basket.

        My 10b5-1 plan is entirely financial and has nothing to do with my excitement for our future. *As those of you who work directly with me know, I literally cannot wait for all the new products and advancements we've got lined up for 2018 and beyond. We're the best team we've ever been, we're putting out our best products ever and I only see this being more the case moving forward. I'm so excited for our future 'cause we're going to rock it*!!!!

        Thanks for understanding and, if there is any public reaction to the sales, I apologize for this distraction!

Hi5 - Nick

38.     The statements referenced in ¶¶ 23-37 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to

disclose that: (i) demand for the GoPro brand had dramatically declined and retailers were not stocking up for 2017 holiday sales to the extent GoPro had budgeted for; (ii) demand for GoPro's Karma drones was sufficiently weak that the Company could no longer afford to manufacture and sell them profitably; (iii) the Company would be forced to dramatically slash prices on its newly launched HERO6 Black and its dated HERO5 Black and HERO5 Session cameras, as well as its Karma drone, during the quarter and would need to further slash HERO6 prices in January 2018; and (iv) as a result of the foregoing, GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period.

### The Truth Begins to Emerge

39.     On January 8, 2018, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Announces Preliminary Fourth Quarter 2017 Results," revealing results for its 4Q17 – the quarter that included GoPro's all-important 2017 holiday selling season, where it had forecast sales of $470 million and analysts had been led to believe GoPro would report sales exceeding $472 million based on defendants' bullish Class Period statements. The press release stated in relevant part:

> SAN MATEO, Calif., January 8, 2018 - GoPro, Inc. (NASDAQ: GPRO) today reported certain preliminary financial results for the fourth quarter ended December 31, 2017. ***GoPro expects revenue to be approximately $340 million for the fourth quarter of 2017. Fourth quarter revenue includes a negative impact of approximately $80 million for price protection on HERO6 Black, HERO5 Black and HERO5 Session cameras, as well as the Karma drone.***
>
> ***
>
> "As we noted in our November earnings call, at the start of the holiday quarter we saw soft demand for our HERO5 Black camera," said GoPro founder and CEO Nicholas Woodman. "Despite significant marketing support, we found consumers were reluctant to purchase HERO5 Black at the same price it launched at one year earlier. Our December 10 holiday price reduction provided a sharp increase in sell-through."
>
> ***
>
> • ***GoPro is reducing its global workforce*** from 1,254 employees as of September 30, 2017 to fewer than 1,000 employees worldwide.
>
> • GoPro founder and ***CEO Nicholas Woodman will reduce his 2018 cash compensation to $1.***

- 15 -

- Although Karma reached the #2 market position in its price band in 2017, the product faces margin challenges in an extremely competitive aerial market. Furthermore, a hostile regulatory environment in Europe and the United States will likely reduce the total addressable market in the years ahead. ***These factors make the aerial market untenable and GoPro will exit the market after selling its remaining Karma inventory.*** GoPro will continue to provide service and support to Karma customers.

A restructuring of GoPro's business will result in an estimated aggregate charge of $23 million to $33 million, including approximately $13 million to $18 million of cash expenditures as a result of a reduction in force, substantially all of which are severance and related costs, as well as approximately $10 million to $15 million of other charges, consisting primarily of non-cash items. GoPro expects to recognize most of the restructuring charges in the first quarter of 2018. GoPro will provide more detail on its 2017 results and 2018 outlook in its fourth quarter earnings report which will take place in early February.

(Emphasis added.)

40.     On this news, GoPro stock price declined, falling from a close of $7.52 per share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018, before closing at $6.56 per share on unusually high trading volume of more than 59 million shares traded.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired GoPro common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GoPro common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GoPro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of GoPro;

- whether Defendants caused GoPro to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of GoPro securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- GoPro common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold GoPro common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against GoPro and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.     During the Class Period, GoPro and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     GoPro and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GoPro common shares during the Class Period.

55.     GoPro and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GoPro were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of GoPro, their control over, and/or receipt and/or modification of GoPro allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GoPro, participated in the fraudulent scheme alleged herein.

56.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GoPro personnel to members of the investing public, including Plaintiff and the Class.

57.     As a result of the foregoing, the market price of GoPro common shares was artificially inflated during the Class Period.  In ignorance of the falsity of GoPro's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of GoPro common shares during the Class Period in purchasing GoPro common shares at prices that were artificially inflated as a result of GoPro's and the Individual Defendants' false and misleading statements.

58.     Had Plaintiff and the other members of the Class been aware that the market price of GoPro common shares had been artificially and falsely inflated by GoPro's and the Individual Defendants' misleading statements and by the material adverse information which GoPro's and the

Individual Defendants did not disclose, they would not have purchased GoPro's common shares at the artificially inflated prices that they did, or at all.

59.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

60.     By reason of the foregoing, GoPro and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of GoPro common shares during the Class Period.

## COUNT II

## Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of GoPro, and conducted and participated, directly and indirectly, in the conduct of GoPro's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

63.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GoPro's financial condition and results of operations, and to correct promptly any public statements issued by GoPro which had become materially false or misleading.

64.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GoPro disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GoPro to engage in the

1
2

wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GoPro within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GoPro common shares.

3
4
5

65. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GoPro.

6
7

**PRAYER FOR RELIEF**

8

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

9
10

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

11
12
13

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

14
15

C. Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

16
17

D. Awarding such other and further relief as this Court may deem just and proper.

18
19

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

20
21

Dated: January 11, 2018

Respectfully submitted,

22

**POMERANTZ LLP**

23
24

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

25
26
27
28

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II

Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com
E-mail: hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*